IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

25-10609
25-10611

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

Versus

THOMAS ADDAQUAY,

Defendant-Appellant.

_____

DIRECT APPEAL FROM A CRIMINAL CONVICTION
FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

_____

INITIAL BRIEF

> SYDNEY R. STRICKLAND
> Georgia State Bar Number: 418591
> LEIGH ANN WEBSTER
> Georgia State Bar Number: 968087
> Strickland Webster, LLC
> 830 Glenwood Ave SE, Ste 510-203
> Atlanta, GA 30316
> 404-590-7967
> Attorneys for Thomas Addaquay

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

APPEAL NO. 25-10609
25-10611

THOMAS ADDAQUAY,

Defendant - Appellant.

_____/

<u>CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT</u>

Counsel hereby certifies that the following may have an interest in the outcome of this appeal:

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. Rule 26.1-1, counsel certifies that the following listed attorneys, persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal:

1. Adams, Angela, Assistant United States Attorney;

2. Addaquay, Thomas, Defendant-Appellant;

3. Anand, Justin S., United States Magistrate Judge;

4. Brown, Jeffrey A., Assistant United States Attorney;

C1-5

5.  Daniel, Robert, Former Attorney for Defendant-Appellant;

6.  Gray, Brent A., Assistant United States Attorney;

7.  Martin May, Leigh, United States District Court Judge;

8.  Sneed, Sekret T., Assistant United States Attorney;

9.  Strickland, Sydney; Attorney for Defendant-Appellant;

10. Webster, Leigh Ann, Attorney for Defendant-Appellant;

11. Williams, Rodney, Former Attorney for Defendant-Appellant;

Victims:

12. M.B.;

13. R.B.;

14. H.B.;

15. M.B.;

16. C.C.;

17. C.C.;

18. V.C.L.;

19. C.C.;

20. D.C.;

21. Collette Travel Services;

22. B.C.;

C2-5

23. E.D.;

24. Y.D.;

25. Docherty Associates Limited;

26. P.D.;

27. T.F.P.;

28. R.F.;

29. L.F.A.;

30. G&G Recreational Ventures Inc.;

31. L.G.;

32. D.H.;

33. G.H.;

34. T.H.;

35. K.I.;

36. B.K.;

37. J.L.;

38. I.M.;

39. D.M.D.;

40. P.M.;

41. R.M.K.;

42. G.M.;

43. H.M.;

44. K.N.;

45. F.O.;

46. D.P.;

47. P.P.;

48. D.R.;

49. J.R.;

50. J.S.;

51. J.S.;

52. L.S.;

53. J.S.;

54. B.S.;

55. W.S.;

56. T.T.;

57. C.V.;

58. G.W.;

59. S.Y.;

60. J.Z..

No publicly-traded company or corporation has an interest in the outcome of this appeal or case.

Dated this 25th day of September, 2025.

/s/ Sydney R. Strickland
Sydney R. Strickland
Georgia Bar No. 418591
Attorney for Thomas Addaquay

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510 #203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile:  (404) 393-3617
sydney@stricklandwebster.com

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Rule 34(a), F.R.A.P., the Defendant-Appellant requests oral argument because it would significantly aid in the decisional process.

## STATEMENT OF TYPE SIZE AND STYLE

Pursuant to 11th Cir. R. 28-2 (d), counsel for Appellant hereby certifies that the size and style of type used in this brief is Book Antiqua 14 PT.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................ C1-5

STATEMENT REGARDING ORAL ARGUMENT ........................................... i

STATEMENT OF TYPE SIZE AND STYLE ..................................................... ii

TABLE OF CONTENTS ..................................................................................... iii

STATEMENT OF JURISDICTION .................................................................. viii

STATEMENT OF THE ISSUES ............................................................................ 1

STATEMENT OF THE CASE .............................................................................. 2

    I.     Course of Proceedings ............................................................................ 2

    II.    Statement of the Facts ............................................................................ 4

STANDARDS OF REVIEW ................................................................................ 24

SUMMARY OF THE ARGUMENT ................................................................... 25

ARGUMENT AND CITATIONS OF AUTHORITY ..................................... 27

    I.     The evidence was insufficient for a reasonable trier of fact to find Mr. Addaquay guilty of the substantive wire fraud and aggravated identity theft counts ...................................................................................................... 27

        A.    Counts 2-5 and 7-11 (Wire Fraud) ................................................. 27

        B.    Counts 13-16 (Aggravated Identity Theft) ..................................... 31

    II.    The district court erred by finding that there was no *Brady/Giglio* violation. ..................................................................................................... 32

      A.  The Awiti and Liady memoranda should have been disclosed as *Brady* material. ..................................................................................... 34

      1.  The memoranda were exculpatory and/or impeaching. .............. 34

      2.  The government suppressed the evidence here. ............................ 40

      3.  The suppression of the evidence plainly prejudiced Mr. Addaquay. ............................................................................................... 41

      4.  The district court incorrectly concluded that the evidence did not constitute either *Brady* or *Giglio* evidence. .............................. 46

        i.   The district court's focus on ways in which the Awiti memorandum could plausibly be consistent with the trial evidence ignores the inquiry mandated by the Supreme Court. ..................... 46

        ii.  The evidence was not inculpatory as to the crimes charged. .... 48

     iii.     The district court's factual findings were incorrect.................49

    B.  The Awiti memorandum was *Giglio* evidence. ...............................50

       1.   The government presented testimony that it knew or should have known was false when it permitted Edwards to testify...........53

       2.   The use of Edwards' perjured testimony was material..............54

III.    The district court abused its discretion by denying the motion to compel........................................................................................................55

IV.    The district court clearly erred in determining the amount of loss and restitution. ...............................................................................................59

   A.     The loss amount is not supported by "reliable and specific evidence" because the fact that a tax return was marked by the IRS as "frozen or otherwise flagged," does not mean that the return was fraudulent. .........................................................................................60

   B.     Even if it could be assumed that the 158 frozen or flagged returns were fraudulent, there is no evidence that Mr. Addaquay was responsible for that fraud. .......................................................................61

   C.     There was no reliable evidence establishing that Mr. Addaquay was responsible for the fraudulent returns of the 15 taxpayers interviewed in the sentencing investigation, or the 69 returns filed using fraudulent PTINs. ........................................................................64

   D.     The district court's loss amount is impermissibly speculative because it arbitrarily applied a 25% reduction........................................65

CONCLUSION ...........................................................................................66

CERTIFICATE OF COMPLIANCE.................................................................68

CERTIFICATE OF SERVICE...........................................................................69

## TABLE OF AUTHORITIES

SUPREME COURT CASES

*Banks v. Dretke*, 540 U.S. 668 (2004) ........................................................32, 33, 40

*Berger v. United States*, 295 U.S. 78 (1935) ........................................................34

*Brady v. Maryland*, 373 U.S. 83 (1963) .......1, 11, 15, 16, 24, 25, 32, 40, 46, 51, 58

*Giglio v. United States*, 405 U.S. 150 (1972) ....1, 11, 15, 16, 24, 25, 32, 46, 50, 51,

………………………………………………………………………………..58

*Glossip v. Oklahoma*, 145 S.Ct. 612 (2025).......................................................52, 53

*Jackson v. Virginia*, 443 U.S. 307 (1979) .................................................................27

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...................................................33, 34, 41, 42

*Napue v. People of State of Illinois*, 360 U.S. 264 (1959).....................................50

*Rosemond v. United States*, 572 U.S. 65 (2014) .....................................................31

*Smith v. Cain*, 565 U.S. 73 (2012) ..........................................................................41

*United States v. Agurs*, 427 U.S. 97 (1976)............................................................51

CIRCUIT COURT CASES

*Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994).......................................................51

*Graves v. Dretke*, 442 F.3d 334 (5th Cir. 2004) ...................................................37

*States v. Gonzalez*, 834 F.3d 1206 (11th Cir. 2016)..............................................24

*United States v. Alzate*, 47 F.3d 110 (11th Cir. 1995)..........................................46

*United States v. Annamalai*, 939 F.3d 1216 (11th Cir. 2019) .........................59, 62

*United States v. Arias–Izquierdo*, 449 F.3d 1168 (11th Cir. 2006) ......................55

*United States v. Barber*, 591 F. App'x 809 (11th Cir. 2014)................................62

*United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011) ........................31, 58

*United States v. Brester*, 786 F.3d 1335 (11th Cir. 2015)....................................24

*United States v. Cessa*, 861 F.3d 121 (5th Cir. 2017) ..............................................37

*United States v. Chavez*, 951 F.3d 349 (6th Cir. 2020) .........................................31

*United States v. Exavier*, 783 F. App'x 849, 852 (11th Cir. 2019)………………55

*United States v. Feldman*, 931 F.3d 1245 (11th Cir. 2019) ..................................27

*United States v. Grant*, 431 F.3d 760, 762 (11th Cir. 2005) ................................24

*United States v. Gupta*, 572 F.3d 878 (11th Cir. 2009) ...................................59, 65

*United States v. Isaacson*, 752 F.3d 1291 (11th Cir. 2014)..................................59

*United States v. Jenkins,* 701 F. App'x 897 (11th Cir. 2017)...............................62

*United States v. Jordan*, 316 F.3d 1215 (11th Cir. 2003).....................................36

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) .................................48, 49

*United States v. Markovich*, 95 F.4th 1367 (11th Cir. 2024).............................24

*United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007)..............................27, 65

*United States v. Mendez*, 528 F.3d 811 (11th Cir. 2008) .....................................29

*United States v. Ragan*, 24 F.3d 657 (5th Cir. 1994).............................................30

*United States v. Sepulveda*, 115 F.3d 88 (11th Cir. 1997)...................59, 61, 63, 65

*United States v. Severdija*, 790 F.2d 1556 (11th Cir. 1986) ................................40

*United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017).......................................51

*United States v. Triumph Capital Group, Inc.*, 544 F.3d 149 (2d Cir. 2008).......37

*United States v. Vallejo*, 297 F.3d 1154 (11th Cir. 2002) ....................................40

## RULES

11th Cir. R. 28-2 (d) ............................................................................................. ii

11th Cir. Rule 26.1-1 ...........................................................................................1

Fed. R. App. P. 4 ...........................................................................................viii

Fed. R. App. P. 26.1 ...........................................................................................1

Fed. R. App. P. 32(a)(7)(B)(iii)..........................................................................67

Fed. R. App. P. 34(a)......................................................................................... i

## STATEMENT OF JURISDICTION

The Eleventh Circuit Court of Appeals has jurisdiction to consider this case pursuant to 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4. This case involves a direct appeal of a criminal conviction and sentence imposed in the United States District Court for the Northern District of Georgia, Atlanta Division.

## STATEMENT OF THE ISSUES

I.      The evidence was insufficient for a reasonable trier of fact to find Mr. Addaquay guilty of Counts 2-5, 7-11 (wire fraud), and 13-16 (aggravated identity theft).

II.     The district court erred by finding there was no *Brady/Giglio* violation.

A. The Awiti and Liady memoranda should have been disclosed as *Brady* material.

B. The Awiti memorandum was *Giglio* evidence.

III.    The district court abused its discretion by denying Mr. Addaquay's motion to compel the government to produce *Brady/Giglio* evidence.

IV.     The district court clearly erred in determining the amount of loss and restitution.

1

STATEMENT OF THE CASE

## I.    Course of Proceedings

In 2020, Mr. Addaquay was charged in case number 1:20-CR-45 with several counts of fraud.  (N.D. Ga. 1:20-cr-45 ("45", doc. 1). While that case was pending, Mr. Addaquay was charged in case number 1:20-CR-126 with conspiracy to commit wire fraud, 18 U.S.C. § 1349; 10 counts of wire fraud, 18 U.S.C. § 1343; 5 counts of aggravated identity theft, 18 U.S.C. § 1028A; money laundering conspiracy, 18 U.S.C. § 1956(h)); and 12 counts of money laundering, 18 U.S.C. § 1957. (N.D. Ga. 1:20-CR-126 ("126"), doc. 1).[1]  He proceeded to trial in case number 1:20-CR-126, and was convicted on all counts. (Doc. 185).

Subsequently, Mr. Addaquay entered a negotiated plea of guilty to one count of structuring transactions, in violation of 31 U.S.C. §§ 5324(a)(1) and 5324(d), and the 45 indictment was dismissed. (45 Doc. 154; N.D. Ga. 1:23-CR-290 ("290"), doc. 3).  In a consolidated sentencing, Mr. Addaquay was sentenced to a total of 150 months. (Doc. 284). Mr. Addaquay filed a timely

---

[1]  Any factual citation without the case number refers to the 126 case; any citation to the docket from other cases will include a reference to that case number, *i.e.*, (45 Doc. 1).

notice of appeal in each case, (Doc. 285; 290 doc. 35), and the cases were

consolidated in this Court.

## II.  Statement of the Facts

### A. Case Number 1:20-CR-126

The substantive wire fraud charges were as follows.

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| 2 | 3/11/2015 | Wire transfer in the amount of $53,012.14 from Reliafund Inc. to United Consolidated Accounting and Business's BB&T Bank Account ending in x3566 |
| 3 | 3/13/2015 | Wire transfer in the amount of $34,532.30 from Reliafund Inc. to United Consolidated Accounting and Business's BB&T Bank Account ending in x3566 |

| | | |
|---|---|---|
| 4 | 3/16/2015 | Wire transfer in the amount of $26,961.00 from Reliafund Inc. to United Consolidated Accounting and Business's BB&T Bank Account ending in x3566 |
| 5 | 3/17/2015 | Wire transfer in the amount of $17,619.35 from Reliafund Inc. to United Consolidated Accounting and Business's BB&T Bank Account ending in x3566 |
| 6 | 3/17/2015 | Wire communication associated with the deposit of fraudulent tax refund check into J.P. Morgan Chase Bank Account ending in x9756 |
| 7 | 3/19/2015 | Wire transfer in the amount of $18,213.30 from Reliafund Inc. to United Consolidated Accounting and Business's BB&T Bank Account ending in x3566 |
| 8 | 3/20/2015 | Electronic filing of tax return for J.H. for tax year 2014 |
| 9 | 3/20/2015 | Electronic filing of tax return for R.M. for tax year 2014 |
| 10 | 3/20/2015 | Electronic filing of tax return for T.S. for tax year 2014 |
| 11 | 3/30/2015 | Electronic filing of tax return for E.B. and G.B. for tax year 2014 |

(Doc. 1 at 7-8). The aggravated identity theft counts charged the use of individuals' names and social security numbers: D.S. (Count 12), J.H. (Count 13), R.M. (Count 14), T.S. (Count 15), G.B. (Count 16). (*Id.* at 9).

At trial, the government told the jury during its opening statement that Mr. Addaquay used stolen personal information to file fraudulent tax returns and collect the refunds, and that his business, United Consolidated Accounting and Business Services ("UC"), was a "sham" used to "cover-up" the crimes. (Doc. 241 at 10-13). Mr. Addaquay, however, stated that the evidence would show that UC was a legitimate check-cashing business that specialized in cashing third-party tax refund checks for tax preparers. (*Id.* at 19-20).

Kevin Edwards—who had previously pleaded guilty in a separate fraud case and was given immunity for his testimony in this case—walked the jury "through each step of this tax refund fraud scheme." (Doc. 243 at 43; doc. 244 at 7). Edwards testified that he offered to help Mr. Addaquay "with his problem that they were having with . . . cashing IRS checks," or "refund anticipation loan checks" after overhearing Mr. Addaquay on the phone one day. (*Id.* at 14-15). According to Edwards, he and Mr. Addaquay

5

agreed that Edwards would receive 30 percent of the funds in exchange for cashing the checks. (*Id.* at 15).

Edwards testified that Mr. Addaquay "would get people to file their income tax fraudulently by taking their social security numbers and filing their taxes." (*Id.* at 16-17).  He claimed that Mr. Addaquay would pay other people to give him folders containing the personal identifying information ("PII") of others, and then take that information to his office on Lenox Road where "he had a tax preparer."  (*Id.* at 17). Edwards testified that Mr. Addaquay directed "[h]is partner, [Michael] Awiti," to prepare tax returns for him using the PII that Mr. Addaquay received, and then they used those returns to get refund anticipation loan checks that Edwards deposited or cashed. (*Id.*  at 23-29, 32, 37).

Edwards testified that, on two occasions, Mr. Addaquay had Edwards give cashier's checks to Mr. Awiti for his portion of the proceeds.  (*Id.* at 39). Edwards was the only witness who testified that a tax preparer filed false tax returns at Mr. Addaquay's direction using stolen PII.[2] Edwards' business relationship with Mr. Addaquay ended in 2012. (*Id.* at 16, 41).

---

[2] Simon Wedderburn and Amar Medjedovic testified that tax preparers, including Awiti, worked at Mr. Addaquay's office, but did not testify that (1) those preparers used stolen PII, (2) Mr. Addaquay provided any information for the preparers to use in false

UC used Reliafund, a third-party payment processing company, from November 2012 through June 2015. (Doc. 241 at 53-54, 59-60, 84, 101).  Check cashing businesses used Reliafund's software to scan images of the checks, which were then sent in batches as an electronic transmission to Reliafund. (*Id.* at 58). Reliafund deposited the batches with its own processing bank and issued the resulting money — minus a fee — to the check cashing business. (*Id.* at 57-59).

Over the course of their relationship, Reliafund processed $12,784,268.60 in deposits from UC.   (*Id.* at 84; Gov't Exh. 15). The government admitted copies of all of the checks processed. (Doc. 241 at 86, 89; Gov't Exh. 16, 17, 18). Peterson said that tax preparers could offer an "immediate refund," a "fairly popular concept." (Doc. 241 at 89).  Mr. Addaquay also reported that tax preparation companies brought him checks for cashing. (*Id.* at 101).

At some point, Reliafund told Mr. Addaquay that it was concerned that some checks were returned as unauthorized or fraudulent.  (*Id.* at 93-94).  However, of the over 4,000 checks sent by UC, only 48 "came back bad."

---

tax returns, or (3) those preparers were operating at Mr. Addaquay's direction.  (Doc. 241 at 153-55; doc. 242 at 20-21).

(*Id.* at 104).  Check cashing was a high-risk business because some of the checks presented "are going to be bad, some of them are going to be fraud." (*Id.* at 102-03). In fact, that is why check cashing businesses often used services like Reliafund: banks did not want to deal with the potential of fraudulent checks. (*Id.*)

Simon Wedderburn worked for Mr. Addaquay, along with Michael Awiti and a woman that Wedderburn could not name.  (Doc. 241 at 148, 150, 153-54, 159).  Awiti was "doing taxes," but Wedderburn did not know exactly what he did. (*Id.* at 155).

Wedderburn eventually worked at the UC storefront in Marietta. (*Id.* at 156-57). The store closed temporarily, and Wedderburn oversaw the construction to adapt the building for the check-cashing business. (*Id.* at 158, 160).  Wedderburn saw some customers—one or two at a time—coming in to talk to Christopher Osaigbovo, who initially owned that location, about taxes. (*Id.* at 160). Osaigbovo trained Wedderburn on how to cash checks, although Wedderburn did not see much check-cashing activity. (*Id.*).

Mr. Addaquay would also send Wedderburn checks to "verify," which he did by calling a number and giving the verification code listed on the

8

check. (*Id.* at 179-80). Wedderburn never saw "anyone printing out" checks "or anything like that." (*Id.* at 195).

Amaj Medjedovic began working for Mr. Addaquay in 2012, after meeting him while working as a bank teller. (Doc. 242 at 13-14). Medjedovic planned to work in the check cashing store, possibly as a store manager. (*Id.* at 18-19). He was tasked with calling to verify checks, depositing the checks into an account he had opened, and making withdrawals. (*Id.* at 25, 54-55). Medjedovic testified that his "understanding was [Mr. Addaquay] had a relationship with tax preparers or C.P.A. firm[s]," and that was where the checks came from. (*Id.* at 25).

Sacoya Lyons, a co-defendant, dated Mr. Addaquay on and off for several years. (Doc. 242 at 72-74, 76). On two occasions, Mr. Addaquay asked Lyons to "endorse" tax refund checks by signing the name of the person that the checks were made out to. (*Id.* at 96-98). She then placed the checks into "a scanner type machine" in his office at Lenox Road. (*Id.* at 98). Lyons also saw another woman at the office signing checks. (*Id.* at 101-02).

Elizabeth Washington, Mr. Addaquay's friend, worked for his business for a short period in 2011. (Doc. 242 at 230-33, 455-56). Mr. Addaquay gave her a folder of "customer lists" and asked her to put the information in an

9

Excel spreadsheet and also "check the refund status of those customers." (*Id.* at 233). The lists included personal information, such as the customers' addresses and social security numbers. (*Id.*).

According to IRS Special Agent Matt Stevens, the case agent, 99 percent of the 4,000-plus checks sent to Reliafund "appeared to be tax refund related checks." (Doc. 243 at 141, 144-45). They were not United States Treasury checks, but instead, were checks issued by third parties, such as E-Collect, Advent Financial, New Capital Bank, Ohio Valley Bank (Refund Advantage), and others. (Gov't Exhs. 16-18).

Stevens also testified about various emails to or from Mr. Addaquay. (Doc. 243 at 145-52). One email from May of 2013 had an attachment that had names, social security numbers, and dates of birth. (*Id.* at 148-49; Gov't Exh. 119). An email from Nana Addaquay ("Nana"), Mr. Addaquay's brother and codefendant, to Mr. Addaquay appeared to include instructions on how to fill out tax returns using Drake Software. (Doc. 243 at 150-51, Gov't Exh. 117). Stevens described a 2013 email from Nana that had other individuals' PII. (Doc. 243 at 152). Stevens found that suspicious returns had been filed for some of the people on that list, and found the same names in checks processed by Reliafund. (*Id.* at 152-57).

10

Several taxpayers who had fraudulent tax returns filed in their names—the checks for which were processed by UC—testified that they never authorized the tax preparer listed to file a tax return. (Doc. 241 at 111-19, 120-28, 130-36; doc. 242 at 151-58, 160-65, 166-72, 185-91; doc. 243 at 98-103, 110-14, 119-24).

Several individuals who were listed as the owners of PTINs[3] on some of the returns, and each testified that she had never applied for a PTIN and had never worked as a tax preparer. (Doc. 241 at 34-35, 141-46; doc. 242 at 173-77; doc. 243 at 93-97, 111-18). There was no evidence that Mr. Addaquay was involved with those PTINs.

Mr. Addaquay was found guilty on all counts. (Doc. 185).

**B. Post-Trial proceedings**

Immediately before sentencing was scheduled, the government provided four memorandums related to the prosecutions of Michael Awiti and Gianna Liady, both in the Northern District of Georgia, in response to a *Brady/Giglio*[4] request.  (*See* 126 Doc. 236 at 1-2 and Attachment 1).[5]

---

[3] PTINs are personal identification numbers issued by the IRS to allow tax preparers to file for their customers.

[4] *Brady v. Maryland,* 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150, 153 (1972).

[5] The memoranda are cited by referring to the last name of the individual being interviewed; Liady 1 refers to the March 9, 2017 memorandum; Liady 2 is the April 28,

11

i.    Awiti Memo

During two interviews in October-November 2015, Awiti was imprisoned for his role in a stolen identify and tax refund ("SIRF") scheme. (Awiti at 1). In 2010, he started preparing fraudulent tax returns using stolen PII acquired from four individuals that he named in the interview, none of which were Mr. Addaquay. (*Id.* at 1-2). He used the Drake Tax Software System, and he opened multiple accounts using multiple names and EFINs so the information could not be linked to him. (*Id.*). He used E-Collect and Advent to process his refunds for printout in check form. (*Id.* at 2).

Awiti said that he paid $1,000 to use the fingerprint of T.P. to obtain an EFIN for filing tax returns on the purchased identities. (*Id.* at 3).  T.P. was aware that Awiti prepared tax returns using stolen identities. (*Id.*). Although Edwards stated that T.P. was a "runner" who "gave Thomas government checks or Treasury checks," (PSR ¶ 64), Awiti said that Edwards cashed refund checks received after T.P. filed false tax returns,  (Awiti at 3).

Awiti was introduced to Mr. Addaquay by a friend several years prior to the SIRF scheme. (*Id.* at 2). Awiti eventually told Mr. Addaquay that he

---

2016 memorandum; Liady 3 is the May 2, 2016 memorandum.  The page numbers refer to the page numbers on the memoranda.

needed someone to cash the refund checks; he said Mr. Addaquay was aware that the checks were obtained using stolen PII. (*Id.*). Mr. Addaquay introduced Awiti to Edwards; specifically, Mr. Addaquay drove Awiti to a restaurant to meet with Edwards in late 2011 or early 2012. (*Id.*). The three of them initially sat together, but eventually, Mr. Addaquay moved to another table to allow Awiti and Edwards to speak privately. (*Id.*). Awiti and Edwards discussed the plan for Edwards to cash refund checks for Awiti, agreeing that Awiti would receiving 60% of the profit and Edwards would receive 40%. (*Id.*).

Thereafter, Awiti would print the refund checks and give them to Edwards for cashing. (*Id.*). Edwards would later give Awiti his share, primarily in cashier's checks. (*Id.*). Mr. Addaquay was never present for the handoffs of checks or payment, "as Addaquay only made the introduction and was no longer involved with any other part of the subsequent transactions." (*Id.*).

When Edwards paid Awiti in cash, Awiti would sometimes purchase money orders and then have Mr. Addaquay convert the money orders into cashier's checks to make them appear to have come from a legitimate source. (*Id.*). Awiti paid Mr. Addaquay a fee of 10-15%. (*Id.* at 3). When shown

13

various cashier's checks written to him, Awiti said the ones from Mr. Addaquay represented conversion payments of money orders he provided to Mr. Addaquay. (*Id.*).

Awiti also said that Mr. Addaquay cashed refund checks for other tax preparers that filed tax returns using stolen identities, but he did not say that Mr. Addaquay knew that the checks resulted from fraudulent returns. (*Id.*). Awiti further stated that Edwards primarily cashed tax refunds checks for him. (*Id.*).

 ii. <u>Liady Memos</u>

In 2017, Gianna Liady pled guilty to filing a false federal tax return for 2014. (NDGA case number 1:17-cr-394, doc. 1). In a March 2017 proffer, Liady explained that, in December 2013, she and K. Liady opened K-1 in anticipation of the 2014 tax filing season. (Liady 1 at 1- 2). Liady had previously worked for Point 1, where she learned how to falsify Schedule Cs to increase taxpayer refunds. (*Id.*). While operating K-1, she continued to prepare false returns for her clients. (*Id.*). The assistant manager of the business was Yolanda Webb Neal ("Webb"). (*Id.* at 7). Gianna knew that Webb and another person were filing returns using stolen identities in 2013, although she did not know where the PII came from. (*Id.* at 7).

14

Gianna and K. Liady identified others involved in their fraudulent tax return scheme. (Liady 2 at 4-5). Gianna also provided a spreadsheet of EFINs, companies, and individuals associated with Point 1. (Liady 3 at 2). Mr. Addaquay was not mentioned during either proffer.

### iii. *Brady/Giglio* litigation

Upon receiving the Awiti and Liady memoranda, Mr. Addaquay moved to dismiss the indictment, or in the alternative, for a new trial. (Doc. 236). He argued that the Awiti material (1) directly contradicted the government's theory of the case that Mr. Addaquay was obtaining PII and directing the preparation of false tax returns; and (2) plainly contradicted the testimony from Kevin Edwards at trial, such that it was compelling impeachment evidence. (*Id.* at 13-14). As to Liady, the evidence showed that the tax preparers were committing fraud on their own and without Mr. Addaquay's involvement. (*Id.* at 14). Mr. Addaquay noted that there were checks from UC accounts to K-1 Financial and Webb, indicating that K-1 and Webb used UC to process tax refund checks and supporting the conclusion that Mr. Addaquay was not involved in the underlying fraud. (*Id.* at 14; doc. 268-3). After briefing, the district court denied the motion. (Doc. 253).

15

Mr. Addaquay also filed a motion to compel additional *Brady/Giglio* evidence, requesting discovery that fell into several categories: evidence regarding Awiti and Edwards, evidence that generally tended to show that Mr. Addaquay was not involved in the underlying tax preparation fraud, and other miscellaneous information. (Doc. 251). Mr. Addaquay eventually filed supplemental and renewed motions to compel. (Doc. 256, 268). Eventually, the court ordered the government to produce all copies of tax returns associated with checks cashed by UC, but otherwise denied the motion. (Docs. 269, 270, 273).

## C. <u>Sentencing</u>

Mr. Addaquay's consolidated guideline range was calculated as follows.

### <u>Group A: Case number 1:20-cr-126</u>

**Subgroup 1: Wire Fraud**

| Guideline Provision | Description | Points |
|---|---|---|
| U.S.S.G. § 2B1.1 | Base Offense Level | 7 |
| *U.S.S.G. § 2B.1(b)(1)(J)* | *Loss amount $13,785,093.67* | *+20* |
| U.S.S.G. § 2B1.1(b)(2)(A)(i) | 10 or more victims | +2 |
| U.S.S.G § 2B1.1(b)(10)(C) | Sophisticated means | +2 |
| U.S.S.G § 3B1.1(a) | Leadership role | +4 |
| *U.S.S.G § 3C1.1* | Obstruction of justice | +2 |
| | *Total Offense Level* | *37* |

**Subgroup 2: Money Laundering**

| Guideline Provision | Description | Offense Level |
|---|---|---|
| *U.S.S.G. § 2S1.1(a)(1)* | *Base Offense Level* | *31* |
| U.S.S.G. § 2S1.1(b)(2)(A) | § 1957 conviction | +1 |
| *U.S.S.G § 3B1.1(a)* | Leadership role | +4 |
| *U.S.S.G § 3C1.1* | Obstruction of justice | +2 |
| | *Total Offense Level* | *38* |

17

## Group B: Case number 1:23-cr-290

| Guideline Provision | Description | Offense Level |
|---|---|---|
| U.S.S.G. § 2S1.3 | Base Offense Level for $550,000 to $1,500,000 in structured funds | 20 |
| U.S.S.G. § 2S1.3(b)(1) | Proceeds of unlawful activity | +2 |
| U.S.S.G. § 2S1.3(b)(2) | Pattern of unlawful activity | +2 |
| U.S.S.G. § 3B1.1(c) | Role | +2 |
|  | Total Offense Level | 26 |

(PSR ¶¶ 157-208).

Pursuant to U.S.S.G. § 3D1.4, the combined offense level was 38. (PSR ¶ 204). With three levels off for acceptance of responsibility, the total offense level was 35. (*Id.* ¶¶ 205-08).

At the sentencing hearing, Agent Stevens testified regarding the amount of loss and restitution. (Doc. 306 at 8-11). Stevens used "sampling and extrapolation" from the total population of 4,198[6] checks to calculate the loss amount. (*Id.* at 12, 14, 17).

Stevens randomly selected and interviewed 15 taxpayers, all of whom said the checks were the result of fraud. (Doc. 306 at 24, 26-27). The total for

---

[6] Agent Stevens testified to the approximate number of checks, 4,200. The actual number was 4,198. (Doc. 306 at 14, 17).

those returns was $50,767.00. (Doc. 292-2 at 4). Stevens also identified which returns were associated with a PTIN that the trial evidence established to be fraudulent. (Doc. at 25-26; doc. 292-2 at 4). Those 69 returns totaled $23,696.00. (Doc. 292-2 at 4). He then looked at the 16 checks identified as fraudulent from the pre-trial investigation, which totaled $123,696. (Doc. 306 at 28; doc. 292-2 at 4). Mr. Addaquay refers to the totals from these three categories as the "known numbers" throughout this brief.

Agent Stevens then randomly selected 300 third-party tax refund checks, and calculated the average loss per refund. (Doc. 306 at 28, 31; doc. 292-2 at 4). This proposed loss amount assumed that *every check* processed by Reliafund for UC was the result of fraud attributable to Mr. Addaquay, a theory that the district court rejected prior to sentencing and again at sentencing. (Doc. 306 at 94-95, 101).

The government also presented an alternative extrapolated loss amount of $8,034,505.2 by identifying which of the 300 randomly selected checks were associated with returns that had an 841 refund freeze ("841 code") ("the 841 extrapolation"). (Doc. 306 at 34-35; doc. 292-2 at 5). The average loss for the 158 checks with an 841 code was $1,879.13. (*Id.*). Using

19

this average and adding the known numbers, the total loss amount was $8,034,505. (*Id.*).

Stevens did not have the tax returns for the 300 random selections, and had only the "IMFLT" report from the IRS files, which is "more of a transaction code listing" of codes used by the IRS. (*Id.* at 55-57). The IMFLT did not identify the preparer. (*Id.* at 56). Stevens had never worked with those codes, and did not know what all of them indicated. (*Id.* at 57). He testified that the 841 code meant that "the IRS or somebody at the campus is inputting that code to freeze a payment." (*Id.* at 60). The 841 code itself did not indicate that the return was fraudulent, or that it was the result of identity theft. (*Id.*). There were other reasons an 841 code could be applied, such as the payment being mailed to the wrong address. (*Id.* at 61). Stevens could not say why the 841 code was entered on any specific return, nor could he interpret the other codes on the IMFLTs, including codes entered simultaneously with the 841 code. (*Id.* at 62-67).

For the 15 taxpayers interviewed, Stevens used data that the IRS extracted from the returns, which included the name of the tax preparer and tax firm. (Doc. 306 at 41, 43-44). Mr. Addaquay introduced the extraction reports for 7 of the 15, all of which listed Knoxin Mattia as the preparer and

EPS as the firm. (*Id.* at 42-49; Exhs. D-1-D-7).  Stevens did not attempt to investigate Mattia or EPS, and could not say that either was in any way associated with Mr. Addaquay. (Doc. 306 at 49). Likewise, Stevens had not investigated the entities listed on the other three extraction reports shown to him, and could not say they were associated in any way with Mr. Addaquay. (*Id.* at 50-53). Notably, one of those reports listed K-1 Financial as the preparer. (*Id.* at 52-53; Exh. D-10).

Jeffrey Martin, an expert statistician, testified on Mr. Addaquay's behalf that the government used the average, not the median, in its extrapolations, which was problematic because, among other reasons, the randomly selected checks included an "outlier" that skewed the average: one check for $24,499. (*Id.* at 84-85). Using the median, the total from the 841 extrapolation and the known numbers was $5,497,966.07, rather than $8,034,505.24. (*Id.* at 86-87; doc. 290-16).

Martin further explained that one of the government's numbers in the random sample of 300 actually represented 4 checks, not one. (Doc. 306 at 90; *see also id.* at 73-74 (Stevens explaining that the approximately $26,000 included in the sample was the total paid by the IRS for four separate checks, only one of which was randomly selected)).  All four checks made the result

21

unreliable, because "you need to randomly select 300 and not add anything from outside that 300," and "it would affect the average because we're averaging [4] 6,000's instead of one 26,000." (*Id.* at 90).

The district court found a loss and restitution amount of $4,123,474.55. (Doc. 306 at 101). The court recognized that the government's extrapolation had "problems," including the small sample size and the use of all four checks. (*Id.*). The court specifically *did not* "find that every single one of the tax refunds checks processed by Reliafund from United Consolidated is fraud." (*Id.* at 102).

As to the 841 extrapolation, the court found that "it's difficult to use that as a way to approximate it," given that "there is some fraud that is not captured by that code, and there's some cases that aren't fraud that might have been part of that code as well." (*Id.* at 102). In the end, the court used the numbers from the 841 extrapolation, but used "the number that Mr. Martin generated that utilized the median," $5,497,966.07. (*Id.*). The court then "further reduced that amount [by 25%] to compensate for the fact that the government has not shown that all of these checks were in fact due to Mr. Addaquay's fraud." (*Id.* at 103). The resulting loss amount of

$4,123,474.55 yielded an 18-level enhancement for the amount of loss. (*Id.* at 104).

The court found that the offense level was 33. (*Id.* at 128). With a criminal history score of I, the guideline range was 121 to 152 months, plus 24 months consecutive for the aggravated identity theft counts. (*Id.*). The court sentenced Mr. Addaquay to a total term of 150 months. (*Id.* at 136).

## STANDARDS OF REVIEW

This Court reviews the sufficiency of the evidence *de novo*. *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016).

This Court reviews an alleged *Brady/Giglio* violation *de novo*, and the denial of a motion for a new trial for an abuse of discretion. *United States v. Brester*, 786 F.3d 1335, 1338 (11th Cir. 2015). This Court reviews the denial of a motion to compel discovery for an abuse of discretion. *United States v. Markovich*, 95 F.4th 1367, 1375 (11th Cir. 2024).

This Court reviews for clear error the district court's determination of amount of loss under the Guidelines. *United States v. Grant*, 431 F.3d 760, 762 (11th Cir. 2005).

SUMMARY OF THE ARGUMENT

The evidence as to the substantive wire fraud and aggravated identity theft counts was insufficient to sustain Mr. Addaquay's convictions. The government failed to prove that Mr. Addaquay was the culprit for these specific counts, as it failed to connect Mr. Addaquay with any evidence about the specific identities and tax returns at issue.

The district court erred by concluding that Mr. Addaquay had not established a *Brady/Giglio* violation by withholding the Awiti and Liady memoranda. The government suppressed the evidence by not disclosing it to Mr. Addaquay, and the failure to do so was material. If Mr. Addaquay had been armed with the memoranda before trial, he could have rebutted the government's theory that he was responsible for the underlying tax fraud, and he could have thoroughly impeached Edwards' testimony.

The district court abused its discretion by denying Mr. Addaquay's motion to compel. Mr. Addaquay sought evidence that would have shown that he was not involved with the underlying tax fraud—evidence that would have rebutted the government's theory at trial and its amount-of-loss argument at sentencing. The refusal to order its disclosure was an abuse of discretion.

25

Finally, the district court clearly erred by determining the amount of loss because (1) the government failed to prove that all returns with an 841 code were fraudulent; (2) for the relevant conduct, the government failed to prove that Mr. Addaquay was responsible for the underlying fraud; and (3) the court's decision to reduce the loss amount by 25% demonstrated that its loss amount was not based on evidence.

ARGUMENT AND CITATIONS OF AUTHORITY

I.    **The evidence was insufficient for a reasonable trier of fact to find Mr. Addaquay guilty of the substantive wire fraud and aggravated identity theft counts.**

An essential aspect of due process, as guaranteed by the Fourteenth Amendment, is that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof — defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of *every element of the offense*." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). The evidence must be sufficient for a reasonable jury to conclude that the government has proven guilt beyond a reasonable doubt. *United States v. Medina*, 485 F.3d 1291, 1296-97 (11th Cir. 2007).

**A. Counts 2-5 and 7-11 (Wire Fraud)**

To sustain a conviction for wire fraud, the government must prove that the defendant devised or intended to devise any scheme or artifice to defraud and that the defendant used a wire transmission for the purpose of executing such scheme or artifice. *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019).

Here, the substantive wire fraud counts charged Mr. Addaquay with causing specific transfers from Reliafund into UC bank accounts (Counts 2-

27

5, 7) and with electronically filing tax returns involving named individuals (Counts 8-11). (Doc. 1 at 7-8).[7]  However, the government failed to present any evidence that these specific wire transfers were part of the "scheme or artifice to defraud" alleged in the indictment.

While the government presented evidence that fraudulent tax returns were filed in the names of those charged in these counts, there was no evidence that Mr. Addaquay was the one who filed or directed the filing of those fraudulent returns.  The only evidence adduced at trial was that the fraudulent returns were filed, and that the resulting refund checks were eventually sent by UC to Reliafund and paid into a bank account controlled by Mr. Addaquay. The trial is completely devoid of any evidence establishing how Mr. Addaquay/UC came into possession of any of these specific checks.  Likewise, there was no evidence that Mr. Addaquay or one of his coconspirators ever possessed these individuals' PII, and no evidence that these specific transactions were part of the scheme alleged in the indictment.  (*See* Doc. 1 at 4).

---

[7]  As the government explained in closing, the specific wires charged were the transmission of "bundles" of tax refund checks sent to Reliafund that included the checks related to the testifying witnesses. (Doc. 1; doc. 244 at 39-40).

28

The government's case instead seems to rely on the idea that *all* checks sent by UC to Reliafund must have been the result of fraud and that the fraud must have been perpetrated or directed by Mr. Addaquay—a theory that the district court specifically found to be unsupported by the evidence. (Doc. 303 at 7 ("I never heard anyone . . . that said every single one of these checks is fraudulent. . . . In fact, I heard more of the opposite, . . . that there were few customers, that this was a legitimate business that was purchased"); *see also* doc. 241 at 160 (Wedderborn saw some check cashing); PSR at ¶ 77 (Mr. Addaquay bought an existing check cashing business) PSR at ¶ 9 (Grover estimated that there were 10 to 20 customers per day)).

Rather than proving the specific counts charged, the government showed that Mr. Addaquay had, at times, possessed *some* PII and used it to file fraudulent tax returns. The government then asked the jury to assume that *all* fraudulent tax return checks processed by UC were the result of this same scheme—and Mr. Addaquay's actions. But the government cannot meet its burden with assumptions and speculation. *See United States v. Mendez*, 528 F.3d 811, 814 (11th Cir. 2008) ("When the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction.").

29

While Mr. Addaquay acknowledges that he was sent the PII found in emails from Nana and Elizabeth Washington, that information is not the basis of the specific wires charged in Counts 2-5.  (Docs. 192-40-48, 58-59). Further, Edwards' testimony does not establish that Mr. Addaquay was involved in filing the specific fraudulent returns at issue, as he testified that Mr. Addaquay was receiving PII three to four years prior to the wires charged in the substantive counts.

The evidence here is similar to evidence the Fifth Circuit found insufficient in *United States v. Ragan*, 24 F.3d 657 (5th Cir. 1994).  The government's theory there was that Ragan was involved in several fictitious security trades for the purpose of generating commissions for himself. *Ragan*, 24 F.3d at 658.  A cooperating witnessed testified only to Ragan's involvement in "*uncharged trades*, not the indictment transactions." *Id.* at 660. Because the court could "identify no evidence linking Ragan to the indictment transactions," the evidence was insufficient. *Id.*

The same is true here: without evidence that Mr. Addaquay was involved in the fraud that produced the checks, the government did not meet its burden, and his convictions must be reversed.

30

**B. Counts 13-16 (Aggravated Identity Theft)**

To prove a violation of 18 U.S.C. § 1028A, the evidence must establish that the defendant: (1) knowingly transferred, possessed, or used (2) the means of identification of another person; (3) without lawful authority; (4) during and in relation to a felony enumerated in § 1028A(c).  *United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011) (cleaned up).  A person who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense "is punishable as a principal."  18 U.S.C. § 2.  An aider and abettor must "intend to facilitate that offense's commission."  *Rosemond v. United States*, 572 U.S. 65, 76 (2014) ( "the intent must go to the specific and entire crime" for which the person is charged as an aider and abettor).  *Id.* This showing requires that the defendant had advance knowledge of the crime.  *See id*. at 67.

> Applying *Rosemond*, the Sixth Circuit Court of Appeals has held that
>
> aiding and abetting aggravated identity theft requires the intent to assist the *identity theft*, not just the underlying offense. . . such intent must include (at a minimum) 'advance knowledge' of the identity theft. After all, you can't intentionally assist an identity theft that you only learn about after it's been committed.

*United States v. Chavez*, 951 F.3d 349, 362 (6th Cir. 2020)  (emphasis in original).

31

The aggravated identify theft counts suffer the same deficiency as the wire fraud counts: there was no evidence that Mr. Addaquay used the means of identification for the specific counts, or that he aided and abetted their use. There was no evidence to establish that Mr. Addaquay or anyone he allegedly conspired with actually unlawfully obtained the PII and then used these specific identifies to file these false tax returns. Again, the government cannot meet its burden to prove these specific counts by showing that Mr. Addaquay used other, uncharged identities, or by showing that the funds eventually reached Mr. Addaquay's bank accounts because those actions do not show that Mr. Addaquay had advance knowledge of the identity theft, as required after *Rosemond*. Because there is no evidence that Mr. Addaquay ever possessed or used these identifies, or even that someone he conspired with did, his convictions on these counts must be vacated.

## II.    The district court erred by finding that there was no *Brady/Giglio* violation.

"[T]he suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment regardless of good faith or bad faith of the prosecution." *Banks v. Dretke*, 540 U.S. 668, 691 (2004). A *Brady* claim requires that: (1) the evidence must be favorable to the accused either because it is

exculpatory or it is impeaching; (2) the evidence must have been suppressed

by the prosecution; and (3) prejudice ensued. *Banks*, 540 U.S. at 691.

When determining prejudice, a defendant need *not* show "by a

preponderance of the evidence that disclosure of the suppressed evidence

would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*,

514 U.S. 419, 434 (1995). Instead, the "touchstone" of the prejudice analysis is

> a reasonable probability of a different result, and the adjective is
> important. The question not whether the defendant would more
> likely than not received a different verdict with the evidence, but
> whether in its absence he received a fair trial, understood as a
> trial resulting in a verdict worthy of confidence. A reasonable
> probability of a different result is accordingly shown when the
> government's evidentiary suppression undermines confidence
> in the outcome.

*Id.*

Moreover, "a defendant need not demonstrate that after discounting

the inculpatory evidence in light of the undisclosed evidence there would

not have been enough left to convict . . . [rather the defendant need only

show] that the favorable evidence could reasonably be taken to put the

whole case in such a different light as to undermine confidence in the

verdict." *Id.* at 434-35. Even close questions about disclosures should be

resolved in favor of disclosure, because that sort of disclosure "will tend to

preserve the criminal trial, as distinct from the prosecutor's private

deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Kyles*, 514 U.S. at 439-40; *see also Berger v. United States*, 295 U.S. 78, 88 (1935) (it is well-established that the goal of the government is not to "win a case, but that justice shall be done").

### A. The Awiti and Liady memoranda should have been disclosed as *Brady* material.

1. <u>The memoranda were exculpatory and/or impeaching.</u>

The Awiti memorandum was exculpatory and/or impeaching because it (1) directly contradicted the government's theory of the case that Mr. Addaquay was obtaining PII and directing the preparation of false or fraudulent tax returns; and (2) plainly contradicted the testimony provided by Edwards at trial. As indicated in the sufficiency argument, the indictment specifically alleged—and the government argued at trial—that Mr. Addaquay was involved in the preparation of the false tax returns. Accordingly, any evidence that Mr. Addaquay was not involved in that activity is exculpatory under *Brady*.

The government had no other direct evidence that Mr. Addaquay was involved in preparing and/or filing false tax returns, such that Edwards' testimony was of critical importance to the government's case. With the Awiti proffer, Mr. Addaquay would have been able to rebut this critical

testimony and argue that Edwards was lying about Mr. Addaquay's involvement—and that instead, Edwards committed the actions that he attributed to Mr. Addaquay. Contrary to Edwards' testimony, Awiti proffered that he was preparing false tax returns without any help—or PII— from Mr. Addaquay, that he did not operate at Mr. Addaquay's direction, and that Edwards was cashing checks for him—not Mr. Addaquay.

The chart on the following page breaks down specific contradictions between Edwards' testimony and Awiti's proffer, demonstrating the plainly impeaching nature of the Awiti proffer.

| Edwards Testimony | Awiti Proffer |
|---|---|
| Mr. Addaquay obtained stolen PII from runners and directed Awiti and others to file fraudulent tax returns. (Doc. 243 at 16-18, 20-21, 24, 37-38). | Awiti obtained stolen identities by paying four men that he named, and used them to file fraudulent tax returns on his own. (Awiti at 1-2). |
| Edwards overheard Mr. Addaquay discussing how "they were having reliable people to cash" the checks, and Edwards said he could help him for a fee. (*Id.* at 490-91). Edwards did this for Mr. Addaquay from maybe the end of 2010 until 2012. (*Id.* at 16). | Mr. Addaquay introduced Awiti to Kevin Edwards in 2011/2012 so that Edwards could cash checks for Awiti, but Mr. Addaquay was not involved in that scheme after this initial introduction, other than occasionally converting the resulting money for Awiti. (Awiti at 2). |
| The tax preparers would prepare the rapid refund check, and Mr. Addaquay brought Edwards the checks to cash.    (*Id.* at 85). | Edwards and Awiti agreed that Awiti would print refund checks, and Edwards would cash them. (Awiti at 2). |
| Edwards only provided money to Awiti approximately twice on behalf of Mr. Addaquay, and only because Mr. Addaquay could not meet Awiti. (*Id.* at 39). | Edwards paid Awiti directly using cashier's checks and cash. (Awiti at 2). |
| Mr. Addaquay was involved in every step of the tax refund scheme, from collecting the PII, to cashing the checks. (*Id.* at 16-33). | Mr. Addaquay "only made the introduction and was no longer involved with any other part [of] the subsequent transactions." (Awiti at 2). |

An abundance of caselaw confirms Mr. Addaquay's position that the Awiti memorandum should have been disclosed prior to trial. *See United States v. Jordan*, 316 F.3d 1215, 1253 (11th Cir. 2003) (the government must turn over "impeachment evidence that is likely to cast doubt on the reliability

36

of a witness whose testimony may well be determinative of guilt or innocence") (quotation omitted)); *United States v. Cessa*, 861 F.3d 121, 130-32 (5th Cir. 2017) (302s favorable to defendant where they impeached a trial witness' testimony and supported defendant's theory of defense); *United States v. Aviles-Colon*, 536 F.3d 1, 18-22 (1st Cir. 2008) (reports containing statements that alleged co-conspirators, including the defendant, were actually in rival gangs at war with each other, was impeachment evidence that necessitated a new trial); *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 161-65 (2d Cir. 2008) (reversing denial of motion for new trial based on suppression of proffer notes, in part because any inculpatory effect was "dwarfed by its tendency to exonerate" the defendant); *Graves v. Dretke*, 442 F.3d 334, 345 (5th Cir. 2004) (petition for writ should be granted where the State suppressed two statements of its most important witness, which were inconsistent with his trial testimony).

As to the Liady memoranda, the evidence was exculpatory because it shows that the tax preparers that used UC to cash checks were committing fraud on their own without Mr. Addaquay's involvement, which would have directly rebutted the government's argument that because Mr.

Addaquay cashed the checks, he must have been involved in the underlying fraud as well.

When the *Liady* defendants were investigated, they provided information about how they and others were filing false tax returns, including obtaining PII unlawfully and inflating Schedule C amounts. While they identified people involved in that fraud, they did not mention Mr. Addaquay. Contrary to the district court's conclusion, Mr. Addaquay's argument is not based on speculation about the connection between UC and the *Liady* defendants, as there are checks in the record showing that tax preparers associated with the Liady defendants were using UC to cash their checks. (Doc. 250-1 (check from UC account to K-1 financial endorsed by "G. Liady"); doc. 268-3 (checks from UC accounts to K-1 Financial and Webb and with "Point 1" in the memo line)).

At trial, Mr. Addaquay could have used this evidence to argue that he was not involved in the tax fraud, and instead, that the tax fraud was perpetrated by the preparers without his knowledge. The evidence supports Mr. Addaquay's theory of defense that he was merely cashing checks for tax preparers and he did not aid in the preparation of the taxes or know that those checks were the result of fraud. The government wants to have it both

ways—Mr. Addaquay must have been a participant in the underlying tax fraud because he cashed the fraudulent tax return checks, but evidence that he was not involved in the underlying tax fraud is irrelevant. This Court should reject this stance.

The district court incorrectly concluded that neither the Awiti proffer nor the Liady memoranda were exculpatory and/or impeaching. As to Awiti, the court found that "nothing in the memo suggests that Defendant was not involved in fraudulently filing tax returns." (Doc. 253 at 7). But the memorandum states, "Awiti said Addaquay was never present for the handoffs of checks to be cashed or payments made to Awiti, *as Addaquay only made the introduction and was no longer involved with any other part the subsequent transactions.*" (Awiti at 2) (emphasis added). The memorandum describes at length Awiti's preparation of false tax returns, including how he obtained the PII, but never suggests that Mr. Addaquay was involved. The district court's conclusion that it was not exculpatory is simply not true.

39

2.  The government suppressed the evidence here.[8]

The evidence was suppressed by the government because (1) Mr. Addaquay did not have it and could not obtain it with any reasonable diligence; and (2) the government knew or should have known of the evidence, but did not disclose it.[9]  Briefly, there was no way in which Mr. Addaquay could have obtained memoranda prepared by law enforcement officers as part of another case, even with due diligence.  *See Banks v. Dretke*, 540 U.S. 668 (2004) (rejecting argument that defendant should have asked to interview a witness, who could have furnished the exculpatory evidence that the prosecutor did not disclose); *United States v. Severdija*, 790 F.2d 1556, 1559-60 (11th Cir. 1986) (although defendant knew he had made a statement, did not know have equal access to the written "recordation of those statements," which gave rise to the *Brady* violation).

Second, the government suppressed the evidence. The same prosecutors and case agents were involved in the Awiti case and Mr.

---

[8]    Other cases describe *Brady* as having four elements, which breaks the suppression prong into two elements: the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; and the prosecution suppressed the favorable evidence.  *See United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002).  Mr. Addaquay addresses both of these in this subsection.

[9] The district court assumed that the evidence was suppressed, and therefore, did not address the government's argument that Mr. Addaquay could have discovered the evidence through reasonable diligence.  (Doc. 253 at 6-7 n.1).

Addaquay's case. Specifically, the prosecutor from the Awiti case, Jeffrey Brown, was also the initial prosecutor on Mr. Addaquay's case. (Doc. 1 at 14; case no. 1:14-cr-75, doc. 1 at 5). The initial case agent in this case, Ira Singleton, was present for the Awiti proffer, and in fact, wrote the memorandum from that interview. (Awiti at 1).

As to the Liady evidence, it is of no consequence whether the individual prosecutor herself knew of the suppressed evidence, when it was in the possession of the U.S. Attorney's Office for the Northern District of Georgia. *See Kyles*, 514 U.S. at 437 (prosecutor is responsible for "any favorable evidence known to others acting on the government's behalf in the case including the police."). For these reasons, the government suppressed the evidence at issue here, which Mr. Addaquay could not have obtained even with due diligence.

3. <u>The suppression of the evidence plainly prejudiced Mr. Addaquay.</u>

Here, the government's suppression of the evidence undermines confidence in the outcome. The impeachment of Edwards' testimony is sufficient to meet this burden. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (evidence impeaching primary witness was material even though there were

"various reasons why the jury might have discounted" the witness's undisclosed statements).

Aside from the impeachment evidence, though, the suppressed evidence here was favorable and exculpatory substantive evidence. If Mr. Addaquay had access to the information disclosed by the government, the case at trial would have looked remarkably different. Mr. Addaquay would have been able to show that the government's entire theory of how the tax fraud scheme worked was untrue—and was in fact contradicted by Awiti, one of the people who was actually preparing false tax returns.

Similarly, with the Liady proffer, Mr. Addaquay would have been able to argue that, if UC had cashed checks resulting from fraudulent tax return preparers, it was without his knowledge. Instead, the tax preparers were preparing the fraudulent tax returns on their own, and Mr. Addaquay had no involvement with that fraud. As argued above, the government's evidence that Mr. Addaquay was directly involved in preparing false tax returns was limited. Accordingly, there is a reasonable probability of a different result, as the government's evidentiary suppression undermines confidence in the outcome.

Notably, the suppressed evidence must be considered collectively, not item by item. *Kyles*, 514 U.S. at 436, 440-41 (vacating opinion in part because the Fifth Circuit did not consider the cumulative effect of all of the suppressed evidence). While Mr. Addaquay maintains that the suppression of either required a new trial, the suppression of both categories of evidence is undoubtedly sufficient to undermine confidence in the verdict. With both pieces of evidence, Mr. Addaquay would have been able to argue that tax preparers—including both Awiti and K-1 Financial—were perpetuating tax fraud all on their own, without his assistance, and that the government's key witness was a liar who was blaming Mr. Addaquay for his own actions. This evidence would have directly rebutted the government's allegations that he was involved in the preparation of false tax returns, and it would have cast significant doubt on the credibility of the government's case.

The district court determined that the evidence was "not sufficiently material to undermine confidence in the jury's verdict at trial," citing what it described as "overwhelming evidence supporting the Government's theory that Defendant received stolen PII, prepared fraudulent tax returns using that PII, and converted the ensuing refund checks into his own proceeds." (Doc. 253 at 10). Respectfully, this dramatically overstates the

43

strength of the government's evidence. Edwards was the only witness who testified that Mr. Addaquay obtained stolen PII and used them to file tax returns. There was no evidence linking Mr. Addaquay to any of the rapid tax refund companies, only evidence that he processed the resulting checks. Nor was there evidence connecting Mr. Addaquay to the fraudulent PTINs introduced at trial, or the specific returns in the substantive counts, as argued above.

The court concluded that the evidence would have shown only that Mr. Addaquay "had a slightly different role in the scheme at a specific time than what the Government alleged at trial," and that "other similar fraudulent schemes existed." (Doc. 253 at 11). The court determined that Mr. Addaquay's "precise role in the scheme is immaterial," noting that the "nuance of whether Defendant directed Awiti to prepare fraudulent tax returns or instead willingly helped Awiti do so was unlikely to sway the jury's verdict because Defendant could be equally liable for aiding and abetting the offenses with which he was charged." (*Id.* at 11-12).

First, if the evidence would have "only" shown Mr. Addaquay had a different role in the scheme, that is enough to undermine confidence in the outcome, because the jury was supposed to assess Mr. Addaquay's role and

44

how it affected his guilt or innocence. Regardless, though, to say that the Awiti "describes Defendant's role in the tax conspiracy in a way that is not materially different from the evidence produced at trial" is, at minimum, inaccurate. In the government's version, Mr. Addaquay orchestrated the tax fraud scheme, obtaining the PII, directing the filing of fraudulent returns, and keeping the profits. This is dramatically different from his role in Awiti's version, where it was Awiti and Edwards obtaining PII, filing fraudulent returns, and reaping the benefits—while Mr. Addaquay's only role was making the initial introduction and sometimes converting the form of their profits for them. The significant difference between Awiti's description of Mr. Addaquay's role and Edwards' description is sufficient to require a new trial.

Regarding the Liady evidence, the court concluded that the "failure of defendants in an unrelated prosecution to name Defendant as a co-conspirator was unlikely to affect the jury's decision." (Doc. 253 at 12). But this again ignores Mr. Addaquay's defense—that UC was cashing tax return checks provided by tax preparers and was not aware of the underlying fraud. The fact that UC processed checks for tax preparers implicated in the

Liady memoranda, while there was no evidence that Mr. Addaquay knew about their fraud, would have had a significant impact on the jury.

Because the government suppressed the evidence, Mr. Addaquay was not able to present this evidence to the jury. This requires that his convictions be vacated. *See United States v. Alzate*, 47 F.3d 1103, 1110-11 (11th Cir. 1995) (prosecutor lied to the court and the jury, which caused the Court to reverse, holding, "It may be that Alzate will be convicted after a fair trial. We do not know, but we do know that he has not yet had one."). Here, too, Mr. Addaquay is entitled to a fair trial, and he has not yet had one.

4. <u>The district court incorrectly concluded that the evidence did not constitute either *Brady* or *Giglio* evidence.</u>[10]

i. *The district court's focus on ways in which the Awiti memorandum could plausibly be consistent with the trial evidence ignores the inquiry mandated by the Supreme Court.*

Despite Edwards' testimony that Mr. Addaquay paid for PII and hired Awiti to prepare the tax returns, and Awiti's proffer that he purchased his own PII and prepared fraudulent tax returns, the Court found that these "two accounts are not inconsistent with each other," such that the Awiti

---

[10] This Court reviews the determination of whether the defendant established a *Brady*/*Giglio* violation *de novo* and, therefore, should not give the district court's determination any deference and should conduct its own analysis. Mr. Addaquay addresses the district court's order in an abundance of caution.

46

memorandum did not impeach Edwards. (Doc. 253 at 8-9). Instead, the court wrote that:

> It is entirely plausible that Awiti both purchased PII and used PII provided by Defendant to fraudulently prepare tax returns. It is also plausible that the nature of the scheme changed over time, considering that Awiti primarily described events occurring from 2010 to 2013, while Defendant was charged with fraud lasting from late 2012 through 2016. Thus, Awiti's statements to investigators do not undercut the credibility of Edwards' testimony at trial, meaning that the Awiti Memo is not impeachment evidence.

(*Id.* at 8-9).

The question is not whether there is any world in which the two accounts could "plausibly coexist," as that is not the inquiry mandated by the Supreme Court. The question is whether the testimony was "likely to cast doubt on the reliability of a witness whose testimony may well be determinative of guilt or innocence." *Jordan*, 316 F.3d 1253. Here, there is no question that Edwards' testimony was the most significantly incriminating evidence against Mr. Addaquay, such that it may well have been determinative of guilt or innocence. Awiti's account certainly would have cast doubt on the reliability of his testimony, as described at length above.

While the court discounted Awiti's account because it was about 2010-2013, this is the same time period that Edwards testified about. (Doc. 243 at

47

16, 41 (Edwards' business relationship with Addaquay ended in 2012)). It is not "plausible" that the same men were involved in two separate stolen PII tax fraud schemes at the same time with each playing a different role in the two schemes. Regardless, though, it should have been for the jury to determine if the accounts were plausibly consistent or not.

*ii. The evidence was not inculpatory as to the crimes charged.*

The court concluded that the Awiti proffer was partially inculpatory to Mr. Addaquay because the proffer stated that he helped Awiti convert stolen refunds into cashier's checks. (Doc. 253 at 8). The court reasoned that Mr. Addaquay "could be held responsible for aiding and abetting the substantive offenses in this case," and therefore "Awiti's suggestion that Defendant may have had a lesser role in the scheme at some point does not relieve Defendant of liability." (*Id.*). However, the conduct Awiti described ended in 2013, two years prior to the conduct related to the substantive offenses in 2015. Moreover, there is no evidence linking Awiti to the specific substantive counts. Similarly, the Awiti memo could not have led to Mr. Addaquay's conviction on the wire fraud conspiracy because Awiti was not describing the charged conspiracy.

Regardless, it is not the court's duty to determine if there is *some* theory under which the defendant would still be guilty. *See United States v. Mahaffy*, 693 F.3d 113, 134 (2d Cir. 2012) ("Even if it is by no means certain that arguments based on wrongfully withheld evidence would have swayed the jury, it is a real enough possibility to undermine confidence in the verdict." (cleaned up)). Instead, the Supreme Court has held expressly that a defendant is not required to prove that there would be insufficient evidence to convict him, just that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 434-35. The evidence that the court conceded would have established that Mr. Addaquay acted in a different role is sufficient to "put the whole case in such a different light as to undermine confidence in the verdict."

*iii. The district court's factual findings were incorrect.*

Next, the court made confusing statements that evidenced a misunderstanding of both Mr. Addaquay's arguments and the facts at trial. As to the Liady evidence, the court stated that the fraud scheme described by the Liady defendants was distinct from the fraud alleged here, because the Liady defendants described inflating Schedule C amounts, not filing

entirely false returns using fake PII. (Doc. 253 at 9-10). That is not true. The G. Liady memorandum specifically and repeatedly refers to filing false tax returns based on obtaining people's PII. (Liady 1 at 3, 7, 9, 10 (Liady discussing Webb and others filing SIRF tax returns), 11 ("business income decreased significantly because they stopped filing Profile/SIRF tax returns for that year")).

Additionally, the court stated that "the evidence at Defendant's trial showed that UC received tax refunds for people who were not clients of UC." (Doc. 253 at 10). Later, the court stated that Mr. Addaquay's employees "pointed out significant financial irregularities with Defendant's companies, including the fact that UC appeared to have very few tax customers." (*Id.* at 12). But UC was not a tax preparation company, so of course it cashed checks for people who were not clients of UC and had "very few tax customers," given that it had no tax preparation customers at all.

## B. The Awiti memorandum was *Giglio* evidence.

The Supreme Court has long held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio*, 405 U.S. at 153 (cleaned up). "[I]t is established that a conviction obtained through the use of false evidence,

known to be such by representatives of the [government] must fall under the [Due Process Clause]. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "Little time and no discussion is necessary to conclude that it is improper for a prosecutor to use misstatements and falsehoods." *Davis v. Zant*, 36 F.3d 1538, 1548 (11th Cir. 1994). This includes both evidence that the prosecution knew was false, and evidence that it "should have known" was false. *United States v. Agurs*, 427 U.S. 97, 103 (1976). A conviction obtained using evidence that the government knew, or should have known, was false, "is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*

*Giglio* errors occur when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury. *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017). To establish a *Giglio* claim, a defendant must establish that (1) the government knowingly used perjured testimony or failed to correct when he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could have affected the judgment. *Id.* This requires a new trial unless the government can persuade the court that the false testimony

51

was harmless beyond a reasonable doubt.  *Id.*  "Thus, *Giglio*'s materiality standard is more defense-friendly than *Brady*'s."  *Id.* (quotation omitted).

"The principle that [the government] may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness."  *Napue*, 360 U.S. at 269.  "A lie is a lie, no matter what it's subject," and therefore, it is of no consequence if "the falsehood bore upon the witness's credibility rather than directly upon the defendant's guilt."  *Id.* at 269-70.

The Supreme Court recently reaffirmed *Napue* in *Glossip v. Oklahoma*, 145 S.Ct. 612 (2025).  There, the Court agreed that a new trial was necessary where the State withheld information that would have contradicted the key witness' testimony about his own mental health history, including medication and seeing a psychiatrist.  The evidence was material because his testimony "was the only direct evidence of Glossip's guilt, . . . [such that] the jury's assessment of [the witness'] credibility was necessarily determinative here."  *Id.* at 628.  There, the witness had already been established to be untrustworthy, but the Court emphasized that it was still material because it showed that the witness "was willing to lie to [the jury] under oath."  *Id.*

52

1.  <u>The government presented testimony that it knew or should have known was false when it permitted Edwards to testify.</u>

Here, the government presented testimony that it knew or should have known was false when it presented Edwards' testimony to the jury, despite knowing that it was contradicted by Awiti's proffer. Specifically, the government presented Edwards' testimony to the jury and expressly relied on it in closing argument, emphasizing that Edwards had explained how the tax refund fraud scheme worked. (Doc. 244 at 7). Edwards' testimony was of critical importance to the government's case, just as in *Glossip*, because it was the only evidence of Mr. Addaquay's alleged involvement with the underlying fraud. *See Glossip*, 605 U.S. at 249 (suppressed evidence would have "undermined the prosecution's theory," which was "an important part of the prosecution's case and featured prominently in its opening and closing statements").

And as in *Glossip*, Mr. Addaquay would have been able to argue that Edwards was not just willing to lie, but that he was actively lying to the jury during trial. Notably, while the concealed evidence in *Glossip* did not go directly to the defendant's guilt, the false testimony here goes directly to the crux of the issue—Mr. Addaquay's purported involvement in these crimes. Given the overlap in members of the prosecution team, the government

should have known that Edwards' testimony was false and that—at minimum—it should have disclosed the Awiti memorandum.

2. <u>The use of Edwards' perjured testimony was material.</u>

The use of Edwards' false testimony was material, as there is plainly a reasonable likelihood that the false testimony could have affected the outcome. If the jury had learned that Awiti specifically stated that Mr. Addaquay was not involved in the tax return fraud and, instead, that Awiti was obtaining PII and preparing fraudulent tax returns himself, there is a reasonable probability that the outcome at trial would have been different. The withholding of this evidence is plainly sufficient to undermine confidence in the outcome. Moreover, because the government "affirmatively capitalize[d] on it" by arguing that the jury should believe Edwards in closing, the government violated Mr. Addaquay's due process rights. *See Stein*, 846 F.3d at 1147 (where the government "not only fails to correct materially false testimony but also affirmatively capitalizes on it, the defendant's due process rights are violated despite the government's timely disclosure of evidence showing the falsity."). The government cannot show that the false testimony was harmless beyond a reasonable doubt here. *See id.*

### III. The district court abused its discretion by denying the motion to compel.

"The rule regarding exculpatory evidence announced in *Brady* applies after trial when it is discovered that the prosecution had material information of which the defense was unaware." *United States v. Arias–Izquierdo*, 449 F.3d 1168, 1189 (11th Cir. 2006). However, the district court may decline to order discovery "based upon mere speculation as to whether the material would contain exculpatory evidence." *Id.* (quotation omitted).

Here, Mr. Addaquay has shown that the Awiti and Liady memoranda were *Brady* material, and the district court abused its discretion in denying his motion to compel additional, related information that would be exculpatory at trial and/or at sentencing. Mr. Addaquay's requests included (1) documents and statements related to the investigation into tax entities and preparers implicated in the Liady memoranda that UC cashed checks for; (2) copies of tax returns and associated documents[11] associated

---

[11] This information would include PTINs and EFINs used to file the tax returns. "An EFIN, or Electronic Filing Identification Number, is a unique number assigned to a tax preparer by the Internal Revenue Service that allows a tax preparer to electronically file tax returns on behalf of a taxpayer." (Doc. 249 at 8 n.2); *United States v. Exavier*, 783 F. App'x 849, 852 (11th Cir. 2019) (both PTINs and EFINs are required for electronic filing). Contrary to the government's claim in its response to Mr. Addaquay's motion for new trial, (doc. 249 at 8), there was no testimony at trial regarding EFIN numbers.

with checks cashed by UC, including names and identifying information for the tax preparers; and (3) K-1's client list. Mr. Addaquay discusses each in turn.

First, the Liady memoranda indicate both that K-1, Point 1, Webb, and Rodney Wilson—all of whom cashed checks through UC—were implicated in tax fraud and were being investigated by this U.S. Attorney's Office. (*See* Liady memo at 4-5 (subjects providing information at the apparent request of the interviewing agents/attorneys)). Evidence that these people and entities were conducting their own tax fraud without Mr. Addaquay's involvement is clearly exculpatory, for all of the reasons articulated above. Although the government has asserted at various points that Mr. Addaquay may have conspired with them, there is no evidence in the record to support this assertion.

The second category—information from the tax returns associated with checks processed by UC—is exculpatory and material for similar reasons. The information from the returns is clearly in the possession of the IRS, as Stevens obtained the information for some of the returns for sentencing, including the identity of the preparer. (Doc. 306 at 41, 43-44). Without knowing the preparer listed, Mr. Addaquay was unable to

demonstrate that he was not associated with that preparer, or the use of that identity—as he was able to do at sentencing for the limited documents provided to him. (Doc. 306 at 42-53).

Finally, the evidence shows that K-1 was committing tax fraud, and that UC issued checks to K-1, consistent with the theory that Mr. Addaquay cashed tax refund checks for tax preparers. (Doc. 250-1; doc. 268-3). K-1's client list would have allowed Mr. Addaquay to show that specific checks sent by UC to Reliafund were the result of K-1's fraud—not his own. Again, this evidence is clearly material and exculpatory because it would show that Mr. Addaquay was not the one committing tax fraud.

The district court's denial of the motion to compel as it related to the trial was apparently based on its erroneous finding that the Awiti and Liady memoranda were not *Brady* material, and as a result, the court discussed the requests only as they related to sentencing. (Doc. 253 at 13 ("the Court notes that the information requested by Defendant may still be material to sentencing."); doc. 273). As to the sentencing, the court concluded that evidence related to the tax preparers was not exculpatory because it did not show that Mr. Addaquay was *not* conspiring with those people. (Doc. 273 at 5). But this analysis misplaces the burden both at trial and at sentencing.

57

Mr. Addaquay is not required to show that he was not conspiring with these people; the government had the burden of proof. Had Mr. Addaquay shown at trial that he was not responsible for the tax fraud, the government would have been required to show that he at least knew about the fraud when he cashed the checks—a burden that the government has not even suggested that it could meet.

Accordingly, the evidence that other tax preparers were using UC to process checks from tax fraud is clearly exculpatory and material. Because the district court denied the motion as to sentencing, and apparently as to the trial, based on the incorrect conclusion that Mr. Addaquay had the burden to *disprove* a conspiracy involving these tax preparers, the court abused its discretion by denying the motion to compel. *See United States v. Barrington*, 648 F.3d 1178, 1194 (11th Cir. 2011) (district court abuses its discretion by applying the incorrect legal standard, following improper procedures in making its determination, or making clearly erroneous factual findings). Further, as the court's conclusions rely on its incorrect analysis of the *Brady/Giglio* claims, the errors described above taint its analysis of the motion to compel. As such, this Court should vacate the order denying the

58

motion for new trial and remand for the government to produce the evidence requested in the motions to compel.

## IV. The district court clearly erred in determining the amount of loss and restitution.

If the defendant objects, the government must prove its loss calculation by a preponderance using "reliable and specific evidence." *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997). While the court may rely on estimates, it "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." *Id.*

"[W]here properly performed[,] a statistical estimate may provide a sufficient basis for calculating the amount of loss caused by a defendant." *United States v. Annamalai*, 939 F.3d 1216, 1237 (11th Cir. 2019) (cleaned up). But the Court cannot rely on an "inferential leap" or "too much speculation." *Id.* at 1237-38; *see also United States v. Isaacson*, 752 F.3d 1291, 1306-07 (11th Cir. 2014) ("But this hypothetical causal chain requires inference upon inference for which there is not sufficient support in the record."). While the district court can make an estimate, it cannot do so arbitrarily. *United States v. Gupta*, 572 F.3d 878, 889 (11th Cir. 2009) (disapproving of the amount of loss where the district court "employed an arbitrary approach" and picked

an amount of loss that was about halfway between the two parties' estimates).

### A. The loss amount is not supported by "reliable and specific evidence" because the fact that a tax return was marked by the IRS as "frozen or otherwise flagged," does not mean that the return was fraudulent.

The court's final loss amount was primarily based on an extrapolation from the 158 tax returns that had an 841 code applied by the IRS at some point in time; the court used the median of those 158 returns for the extrapolation. (Doc. 306 at 34, 102-03). But this method improperly assumed that the mere application of an 841 code at some point in time means both that the returns was fraudulent *and* that Mr. Addaquay is somehow responsible for the fraud. This speculation must be rejected.

As Stevens testified, the 841 code only meant that the "the IRS or somebody at the campus is imputing that code to freeze a payment." (Doc. 306 at 60). The 841 code itself did not indicate that the return was fraudulent or that it was the result of identity theft. (*Id.* at 61). Stevens could not say why the 841 code was entered on any specific return, nor could he interpret the other codes, even those entered with the 841 code. (*Id.* at 62-67). Simply put, an 841 code is not a reliable indicator that the return was fraudulent at all.

Indeed, the district court recognized as much, stating that "it's difficult to use that as a way to approximate it," given that "there is some fraud that is not captured by that code, and there's some cases that aren't fraud that might have been part of that code as well." (Doc. 306 at 102). Yet the court used that approximation anyway, despite this Court's clear instructions that the district court "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." *Sepulveda*, 115 F.3d at 890. Using the presence of an 841 code to assume that the return was fraudulent is exactly the sort of speculation that this Court has rejected.

### B. Even if it could be assumed that the 158 frozen or flagged returns were fraudulent, there is no evidence that Mr. Addaquay was responsible for that fraud.

Assuming *arguendo* that the 158 returns were frozen or flagged due to potential fraud, the extrapolation was still impermissibly speculative and unreliable because there was no evidence that Mr. Addaquay was involved in that fraud. *See* U.S.S.G. § 1B1.3(a) (relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and, in jointly undertaken criminal activity, "acts and omissions of others . . . within the scope of the jointly undertaken criminal activity"). Even if it could be assumed that every

61

return with an 841 code was fraudulent, there was no indication of what that fraud was—whether it was inflated or falsified numbers, identity theft, or any other sort of fraud. Accordingly, the 841 codes cannot be used to then assume that the returns were the result of the same type of fraud alleged here—much less the specific fraud attributed to Mr. Addaquay.

The government was required to establish by a preponderance of the evidence that Mr. Addaquay was involved in the underlying fraud. *Compare Annamalai*, 939 F.3d at 1237 (reversing where "there government maintained that all 467 [credit card] disputes involved fraud, even without the three indicators showing the same 'pattern' of fraud"), and *United States v. Jenkins,* 701 F. App'x 897, 902 (11th Cir. 2017) (rejecting the district court's loss amount calculations where the government witness "merely testified that [the Jenkins'] company filed a number of returns that shared certain characteristics with the 16 fraudulent returns—characteristics such as reported business losses and requests for tax refunds that are not uncommon in returns"), *with United States v. Barber*, 591 F. App'x 809, 823-24 (11th Cir. 2014) (affirming where the loss calculation "took into account only the 434 returns filed [by defendant's business] for tax years 2006 through 2008 that reported HSH income, a rare type of income," and excluded "loss stemming

62

from other falsely-reported information"). Here, the court held Mr. Addaquay responsible for every supposedly fraudulent return, without any showing that the fraud was even as of the same nature as that proven at trial.

Importantly, the government relied on fraudulently filed tax returns when there was no evidence that Mr. Addaquay knew about or knowingly participated in that fraud. As discussed above, the Liady memoranda state that tax preparers, including K-1 and Point 1 and individuals like Webb, were preparing fraudulent tax returns without any involvement by Mr. Addaquay. The UC bank accounts show that checks were issued to K-1 and Webb, and some checks list Point 1 in the memorandum line. (*See* Doc. 268-3). Indeed, one of the 15 returns that Stevens randomly selected for an interview was filed by K-1. (Doc. 306 at 52-53). The government has never produced any evidence suggesting that Mr. Addaquay was involved in or even knew about the fraud by K-1, Webb, or Point 1.

Mr. Addaquay cannot be held responsible for checks that were brought to UC for cashing without some evidence suggesting that he cashed them while knowing that they were fraudulently obtained. *See Sepulveda*, 115 F.3d at 890. Confusingly, the district court acknowledged that "the government has not shown that all of these checks were in fact due to Mr.

63

Addaquay's fraud," but still held Mr. Addaquay responsible for them (albeit while also arbitrarily reducing that amount by 25%). (Doc. 306 at 103). This Court must reject the district court's loss amount.

### C. There was no reliable evidence establishing that Mr. Addaquay was responsible for the fraudulent returns of the 15 taxpayers interviewed in the sentencing investigation, or the 69 returns filed using fraudulent PTINs.

The final loss amount includes $50,767 for 15 returns that the taxpayers claimed to be fraudulent in pre-sentencing interviews, and $23,696 from 69 returns filed using PTINS that the trial evidence established were fraudulent. (Doc. 306 at 24, 26-27; doc. 292-2 at 4). This evidence suffers the same problem as the 300 randomly selected returns—there was no showing that Mr. Addaquay was in any way involved in filing of the returns or obtaining the fraudulent PTINs, or that he cashed the resulting checks knowing there was fraud involved. (*See* doc. 306 at 42-53 (could not say that any of the tax preparers were in any way connected to Mr. Addaquay)). Accordingly, he cannot be held responsible for the $50,767 loss to the IRS from the 15 interviews, or the $23,696 from the fraudulent PTINs. *See* U.S.S.G. § 1B1.3(a)(1).

### D. The district court's loss amount is impermissibly speculative because it arbitrarily applied a 25% reduction.

After essentially accepting the government's proposed loss amount—only adjusting it to use the median rather than the mean for the extrapolation—the court "further reduced that amount [by 25%] to compensate for the fact that the government has not shown that all of these checks were in fact due to Mr. Addaquay's fraud." (*Id.* at 103). The court explained that it applied the 25% reduction "in the abundance of caution to reflect the amount that to me the evidence shows is related to Mr. Addaquay's fraud." (*Id.* at 103-04).

The district court provided no reasoning for concluding that 75% of the checks to Reliafund were the result of fraud attributable to Mr. Addaquay. *See Medina*, 485 F.3d at 1304-05 ("the district court clearly erred when it did not make specific factual findings upon which to base the loss amount"). By selecting a percentage to use to reduce the calculated amount of loss, the court "employed an arbitrary approach. It did not make a calculation." *Gupta*, 572 F.3d at 889. As in *Gupta*, because the court did not identify the specific basis for this reduction, "meaningful appellate review of the amount is impossible." *Gupta*, 572 F.3d at 889.

65

Moreover, district court's arbitrary reduction resulted in a loss amount that was not based on reliable and specific evidence. *Sepulveda*, 115 F.3d 882 at 890.  The court was required to determine, based on the evidence, how much of the fraud Mr. Addaquay was responsible for. While the district court framed it as a measure taken "in the abundance of caution," that determination was made without basis or reason.

Consequently, Mr. Addaquay's sentences must be vacated and remanded for a reliable and specific determination of the loss amount in both cases, and the district court must also recalculate his restitution obligation. *See* 18 U.S.C. § 3663A(b)(1)(B) (restitution depends on the amount of the loss).

CONCLUSION

For these reasons, this Court should vacate Mr. Addaquay's convictions and sentences and remand for further proceedings.

Dated:  This 25th day of September, 2025.

/s/ *Sydney Strickland*
Sydney Strickland
Ga. Bar No. 418591

/s/ *Leigh Ann Webster*
Leigh Ann Webster
Ga. Bar No. 968087

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, Georgia 30329
sydney@stricklandwebster.com
law@stricklandwebster.com
(404) 590-7967

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief contains 12,905 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Brief was filed by uploading it with the Eleventh Circuit's Electronic Filing System which will automatically serve opposing counsel with the Brief.

Dated:  This 25th day of September, 2025.

Respectfully submitted,

*/s/ Sydney R. Strickland*
Sydney R. Strickland
Georgia Bar No. 418591
Attorney for Thomas Addaquay

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510 #203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile:  (404) 393-3617
sydney@stricklandwebster.com

69